UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- X

GREAT NORTHERN INSURANCE CO.,

                           Plaintiff,                   <u>MEMORANDUM AND ORDER</u>

      -against-                           06-CV-874 (ERK) (KAM)

POWER COOLING, INC.,

                           Defendant.


-------------------------------------------------------- X

MATSUMOTO, United States Magistrate Judge**:**

            Defendant Power Cooling, Inc. ("Power Cooling") moves this court for dismissal of plaintiff Great Northern Insurance Company's ("Great Northern") complaint on the grounds of spoliation of evidence.  (*See* doc. no. 40, Letter filed by defendant, dated 6/6/07.)  Plaintiff opposes the motion, asserting that defendant was on notice that the evidence, a steam turbine, would be disassembled and repaired, and failed to either object or avail itself of the opportunity to inspect the turbine before it was dismantled.  (*See* doc. no. 41, Letter filed by defendant, dated 6/11/07.)  For the reasons that follow, the court denies defendant's request to dismiss the complaint, and instead, orders that plaintiff be precluded from introducing any evidence regarding the missing or altered turbine parts at trial, or for any other purpose.


## BACKGROUND

            At all relevant times, Great Northern provided insurance coverage to Reckson Associates Realty Corporation ("Reckson") pursuant to Policy No. 3581-16-50.  (*See* doc. no. 1,

Complaint ("Compl.") ¶ 14.)  Reckson, in turn, provided property management services to a forty-two story high-rise building located at 810 Seventh Avenue, New York, New York.  (*See id.* ¶ 7-8.)  On September 16, 2002, Reckson signed a service contract with Power Cooling, Inc. "for the inspection, maintenance, and service of, among other cooling system components, a 1232 horsepower Coppus Murray steam turbine, serial number 5128."  (*Id.* ¶ 9.)  Plaintiff alleges that on May 5, 2005, Power Cooling was servicing the turbine when "a catastrophic . . . failure occurred to the [turbine], causing extensive damage to the [turbine]."  (*Id.* ¶¶ 10, 13.)  Reckson made a claim under its insurance contract with Great Northern for damages resulting from the turbine's failure, and Great Northern duly paid Reckson the amount of $470,352.22.  (*See id.* ¶ 15.)

On February 24, 2006, Great Northern filed this action against Power Cooling for damages sustained by Reckson due to the failure of the turbine, alleging that Power Cooling's negligence caused the turbine to malfunction and fail.  (*See id.* ¶¶ 9, 13-15.)


## PROCEDURAL HISTORY

Following the turbine's failure on May 5, 2005, plaintiff's counsel, Mark E. Utke, Esq., wrote to the Director of Risk Management for Power Cooling on May 13, 2005, stating,

> Please be advised . . . this office will seek to hold Power Cooling and its liability insurance carrier responsible for any proceeds paid as a result of the May 6, 2005 [sic] loss.  In that regard, I request that you immediately forward this correspondence to your liability insurance carrier and request that they contact my office to further discuss this matter.

(Doc. no. 41, Letter filed by plaintiff, dated 6/11/07, Exh. A.)

After Power Cooling failed to respond, Mr. Utke faxed the Director of Risk

Management for Power Cooling a second letter on May 23, 2005 at 3:11 p.m., stating,

> Please be advised, [the] steam turbine is now being transported to New
> Hampshire.  This turbine will be repaired and processed by Energy
> Resources.  In the event that either Power Cooling or its
> representatives desire to send a representative to the Energy Resources
> location for purposes of observing the disassembly of this turbine, I
> request that you immediately contact my office.  I anticipate that this
> breakdown of the turbine will take place on May 24th, 25th, and 26th.
> Although Energy Resources will be retaining all parts from this
> disassembly, your ability to review the steam turbine in its present
> condition will require your presence for this disassembly, if desired.

(*Id.*, Exh. B.)

On May 24, 2005, the Claims Service Bureau of New York, Inc. ("CSB"), the

representative for Power Cooling's insurance carrier, QBE Insurance Group ("QBE"), opened a

claim file for the damage to the turbine.  (Doc. no. 46, Letter filed by defendant, dated 6/22/07,

Exh. A., Affidavit of Marvin Bernstein, dated 6/21/07 ("Bernstein Aff."), ¶ 1.)  Marvin

Bernstein, a claims examiner for CSB, explained that CSB opened the file "after receiving a First

Report of Loss from Hartan Brokerage, Inc., on May 23, 2005, [which] included a letter dated

May 13, 2005 from Mark Utke, Esq., to QBE insured, Power Cooling . . . ."  (*Id.*)  Mr. Bernstein

further stated that he did not receive Mr. Utke's May 23, 2005 letter until May 27, 2005, when

Hartan Brokerage forwarded it to CSB.  (*See id.*, ¶ 2)

On June 10, 2005, Reckson and Energy Resources entered into a contract to

repair the turbine.  (*See* doc. no. 41, Exh. D.)  Phase I included work to inspect the cooling

valves, steam seal, piping, base, supports and overspeed trip assembly, and to inspect and repair

wiring.  (*See id.*)  Phase II included work to replace the turbine shaft and eighth stage wheel and

buckets, and to repair the wheels and buckets for stages one through seven.  (*See id.*)

On July 26, 2005, Mr. Bernstein, claims examiner for CSB, responded to Great

Northern's second letter, dated May 23, 2005:

> In response to your letter addressed to Power Cooling, Inc. dated May
> 23, 2005, we proceeded to conduct an investigation with Power
> Cooling, Inc. with regards to this matter . . . . Based upon our
> investigation . . . , we cannot accept responsibility for damages
> sustained by your client's turbine unit.

(*Id.*, Exh. C.)  Plaintiff asserts that Power Cooling's insurance carrier "never made any further

contact with Great Northern or its counsel."  (*Id.* at 2.)

Energy Resources completed its inspection and repair of the turbine on August

20, 2005.  (*See id.*, Exh. E.)  Seven of the eight stages of the turbine were refurbished and

"placed back into use[,]" but "[t]he eighth stage and the rotor shaft were too severely damaged to

be reused."  (*Id.* at 2.)  Plaintiff's counsel explained that, "[t]o remanufacture the eighth stage, it

was necessary for Energy Resources to send a segment of twenty (20) blades to a machine shop

to be reverse manufactured."  (*Id.*)  In addition, "[s]everal of the broken blades from the eighth

stage were placed into a box . . . [which] was misplaced and cannot be located."  (*Id.*)[1]

Plaintiff's counsel further asserted that, "[a]t no time during the course of the repairs of the

Subject Turbine did defendant Power Cooling or its insurance carrier express an interest in

participating [sic], observing, or taking responsibility for the repairs to the turbine unit."  (*Id.*)

After plaintiff commenced this action on February 24, 2006, the parties appeared

before the undersigned for a settlement conference on April 23, 2007.  To further settlement

negotiations and the parties' preparation for trial, the court granted defendant leave "to retain a

metallurgy expert . . . [to] inspect the turbine and parts."  (Order dated 4/23/07.)

---

[1]  Plaintiff does not provide specific information regarding the circumstances under
which the blades were placed in the box, nor does it explain the nature of any search for the box
of broken blades.

Accordingly, on May 23, 2007, counsel and defendant's experts, including the newly retained metallurgist, Joseph Crosson, traveled to Energy Resource's offices in New Hampshire to inspect the "turbine and its parts." (*Id.*; *see also* doc. no. 40 at 1.) Upon their arrival, however, plaintiff's counsel informed them that the parts had been moved to another facility in New Hampshire. (*See* doc. no. 40 at 1.) After arriving at the second facility, defendant found that "[t]here was the steel shaft and the eighth stage and nothing more. [Plaintiff's expert Michael] Murphy advised [defendant] that the other seven (7) stages had been re-used and re-installed in the subject turbine." (*Id.*) Plaintiff further explained that fifty-three blades were removed from the eighth stage, and placed in a box that subsequently could not be located. (*See id.*) Finally, unbeknownst to defendant, a second box containing four blades and other small parts had been shipped to MIT for mechanical and chemical testing by plaintiff's expert metallurgist. (*See id.*)

The parties promptly called this court on May 23, 2007, for an order regarding the missing turbine parts. The court noted:

> The parties called the court from New Hampshire where defendant's metallurgy expert was to conduct an inspection of "the turbine and parts," as ordered by the court on 4/23/07. Inexplicably, plaintiff failed to make some of the parts available for inspection by defendant's expert, along with the turbine, as ordered. Accordingly, unless defendant's expert must inspect the turbine and parts together, plaintiff is ORDERED to make the parts available at the New York office of its counsel, at plaintiff's expense, no later than 6/7/07.

(Order dated 5/23/07.)

On June 6, 2007, defendant moved this court for an order dismissing plaintiff's complaint on spoliation grounds, alleging that plaintiff almost completely disassembled the turbine and thus "grossly handicapped [defendant's] ability to definitively determine causation

and to shield its experts from attack on claims of speculation or insufficient foundation." (Doc. no. 40 at 2.) Defendant claimed, "[p]laintiff has utterly failed to preserve the evidence in its damaged state for trial . . . . At the time this lawsuit was commenced on February 28, 2006 [sic], plaintiff had already destroyed[,] irrevocably lost, or altered seven (7) stages of the turbine and more than fifty (50) blades from the eighth stage." (*Id.*) That destruction, defendant asserted, "deprived this defendant and its experts of an opportunity to . . . evaluate the turbine . . . [and] determine where, how, and why this failure started." (*Id.*)

Plaintiff responded by letter dated June 11, 2007. (*See* doc. no. 41.) Plaintiff disputed defendant's claim that defendant was not provided with an opportunity to examine the turbine in its damaged state, because Power Cooling first received notice of Great Northern's claim on May 13, 2005 – one week after the turbine's failure – and again on May 23, 2005. (*See id.*, Exh. A and B.) Plaintiff asserted that defendant failed to respond to either letter until July 26, 2005 (more than two months after first receiving notice of the claim), and failed to request that its representatives be present for the turbine's disassembly. (*See id.* at 1-2.) Plaintiff further noted, "[w]hile defendant contends that it was somehow prejudiced by not being able to view the turbine during the course of its repair, [defendant] provides no explanation as to why it chose not to react to the notice letters provided to Power Cooling placing it on notice of plaintiff's claim . . . ." (*Id.*) In addition, plaintiff contended that its own experts "are in no better position tha[n] the defendant's experts, as they have never physically examined (or for that matter, even photographed) the turbine parts that were contained in the box that was misplaced by Energy Resources . . . ." (*Id.* at 3.) Furthermore, plaintiff asserted that defendant's turbine expert, Jeffrey Porges, testified at his deposition that it was not necessary to physically examine the

turbine's parts:

> Q:     [By Mr. Utke] Have you ever physically examined the pieces
>         or parts of the turbine that failed?
> A:     Did not.
> Q:     Did you ever request to examine it?
> A:     No.
> Q:     Is there a reason you didn't request to examine it?
> A:     I didn't see the need to.

(*Id.*, Exh. C, Deposition Transcript of Jeffrey Porges, dated February 6, 2007, at 30:5-19.)

Finally, plaintiff claimed that, under New York law, it had a duty to mitigate the damages caused

by the turbine's failure: "By retaining Energy Resources to rebuild the damaged turbine and only

replacing those parts that were damaged, plaintiff's insured was able to minimize the downtime

associated with losing the use of this turbine to a period of 6 to 8 weeks." (*Id.* at 3.)

The court granted defendant's request to file a reply in support of its motion for

sanctions, and ordered:

> In its reply, in addition to explaining the reasons why defendant did
> not avail itself of the opportunities, as claimed by plaintiff, to inspect
> the complete turbine, and addressing plaintiff's mitigation arguments,
> defendant shall submit a sworn statement from defendant's expert
> explaining more specifically what defendant was able to inspect on the
> subject turbine, why the parts available for examination were
> insufficient, and why the unavailable parts (including but not limited
> to specific turbine stages and blades) must be examined in order to
> render an expert report and opinion.

(Order dated 6/13/07.)

Defendant replied and reiterated its request that the court dismiss plaintiff's

complaint.  Defendant wrote:

> plaintiff acted in bad faith by failing to preserve the turbine and its
> component parts when litigation was anticipated; by failing to disclose
> that evidence was going to be destroyed when, in fact, plaintiff had
> assured the defendant in its May 23, 2005 [letter] that all parts would

be retained[;] and by misrepresenting to the Court and defense counsel
on April 23, 2007 that the entire turbine with the exception of the box
of parts from MIT was available for inspection at the Energy
Resources Group in New Hampshire.

(Doc. no. 46, defendant's reply in support of its motion to dismiss, dated 6/22/07, at 1.)

Defendant asserted that, consequently, it suffered irreparable damage to its ability to defend this
action. (*See id.*) First, defendant noted that plaintiff's May 23, 2005 letter, alerting CSB that the
turbine would be destroyed as early as May 24, 2005, was sent at 3:11 p.m., giving CSP less than
one afternoon to object. (*See id.* at 1-2.) In addition, the May 23, 2005 letter stated that "all
parts" would be retained, an assertion upon which Mr. Bernstein at CSB relied. (*See id.* at 2; *see
also* Bernstein Aff., ¶ 6.) Furthermore, defendant asserted that although CSB promptly opened a
file regarding plaintiff's claim on May 24, 2005, CSB did not receive plaintiff's May 23 letter
until May 27, 2005 – at which point, the turbine was already disassembled. (*See id.*, Exh. A, ¶¶
1-2.) Therefore, CSB, the proper representative of Power Cooling, could not possibly have
objected to the turbine's repair, or requested that defendant's expert be present during the
disassembly.

      In addition, defendant noted that plaintiff's claim that it had a purported duty to
mitigate damages is undermined by the fact that Power Cooling offered to purchase and install a
temporary turbine, and subsequently deliver and install a new turbine, for a total cost of
$432,000, approximately $40,000 less than plaintiff's claim for damages in its complaint. (*See
id.*, Exh. D; Compl. ¶15.)

      Defendant also submitted an affidavit from its metallurgist, Joseph Crosson, who
stated in part:

      [S]ince approximately 52 blades were unaccounted for, the condition

of [the one blade examined by MIT] cannot be relied upon to
determine the root cause of failure of the turbine.  In order to make
such determination[,] it would be necessary to examine the condition
and fractures of all the missing blades for evidence of overstress
fracture, progressive fracture, erosion, corrosion, etc. . . . Thus, in
order to determine the root cause of turbine failure it is necessary to
examine every failed blade.

(*Id.*, Exh. C, Affidavit of Joseph P. Crosson, dated June 21, 2007, ¶¶ 13 - 14.)

On June 26, 2007, plaintiff responded to defendant's reply in support of its

motion to dismiss.[2]  (*See* doc. no. 47, Letter filed by plaintiff, dated 6/26/07.)  Plaintiff claimed

that QBE, the insurance carrier for Power Cooling, should not be rewarded for its lack of

diligence in reviewing plaintiff's claim; that following his visual inspection of the eighth stage

and rotor on May 23, 2007, Mr. Crosson professed no interest in examining the remaining 65

blades on the eighth stage; and that there is no prejudice with respect to the missing box of

blades because plaintiff's expert, like Mr. Crosson, has also never examined those parts.  (*Id.* at

2-3.)

After reviewing the above submissions, and for the reasons cited herein, the court

hereby denies defendant's motion to strike the complaint, but precludes plaintiff from offering

any evidence regarding the missing or destroyed turbine parts at trial, or for any other purpose.

---

[2]  As correctly noted by defendant's counsel, plaintiff failed to request leave of court to
file a sur-reply, as provide by the undersigned's individual practices.  (*See* doc. no. 49, Letter
filed by defendant, dated 6/29/07; Chambers Practices of Magistrate Judge Kiyo A. Matsumoto,
Section IV, A: "replies are not permitted unless specifically authorized.")  Nevertheless, in the
interest of judicial economy, the court considered plaintiff's June 26, 2007 submission, but finds
plaintiff's sur-reply unpersuasive.

## DISCUSSION

### A.      *Mitigation of Damages*

The court first addresses plaintiff's mitigation argument in opposition to defendant's motion for sanctions.  In defense of its decision to disassemble and repair the turbine, plaintiff contends that it had a duty to mitigate damages.  (*See* doc. no. 41 at 3.)  In New York, "an injured party has a duty to mitigate her damages, and in that regard is required to make a reasonable effort and to act as a reasonable, prudent person would under the circumstances." *Salas v. United States*, 974 F. Supp. 202, 211 (W.D.N.Y. 1997).  In support of its claim that it was required to repair the turbine promptly in order to mitigate damages, plaintiff cites *Salas* and *Goldbar Properties, Inc. v. North American Mortgage Investors*, 431 N.Y.S.2d 820, 822 (N.Y. App. Div. 1980), *aff'd*, 53 N.Y.2d 856 (2d Cir. 1981).  Both cases, however, are inapplicable to the instant action.  In *Salas*, plaintiff sustained relatively minor physical injuries from an automobile accident, but subsequently developed a "far more serious psychiatric breakdown." *Id.* at 203.  The court found that plaintiff's failure to take medication prescribed by one of several psychiatrists did not warrant a charge that she failed to mitigate her damages.  *Id.* at 211-212.  *Goldbar Properties* addressed a similarly inapposite situation.  In the context of a mortgage foreclosure action, the state appellate court held that defendants failed to demonstrate that plaintiff should have "foreclosed on the leasehold mortgage in order to mitigate the loss incurred."  *Goldbar Properties*, 431 N.Y.S.2d at 821.

The court finds plaintiff's mitigation argument unpersuasive.  On May 13, 2005, only eight days after the turbine failed, defendant offered to supply and install a new turbine for $365,000.00, and install a temporary turbine for $67,000.00, pending delivery of the new one,

for an amount less than plaintiff now seeks in this action. (*See* doc. no. 46, Exh. D; Compl. ¶ 15.) The difference between the defendant's offer to install a temporary and subsequent new turbine ($432,000) and the amount requested in the complaint ($470,352.22) is $38,352.22. (*See id.*) Plaintiff's insured, Reckson, recommended that defendant's proposal be accepted on May 13, 2005. (*See* Doc. no. 46, Exh. D.) Yet, ten days later, on May 23, 2005, at 3:11 p.m., plaintiff informed defendant, with less than one afternoon's notice, that the turbine was in the process of "being transported to New Hampshire" and "will be repaired and processed" the very next day. (Doc. no. 41, Exh. B.) Therefore, for less cost than the cost of repair of the damaged turbine, temporary and subsequently new turbines could have been installed (thus obviating Reckson Associates' hesitation to "take the risk of running on [the one remaining] machine all summer"). (Doc. no. 46, Exh. D.) Plaintiff thus could have preserved the damaged turbine, in accordance with its duty to preserve evidence, and mitigated its damages, thus undermining its mitigation argument.

**B.     *Spoliation of Evidence***

Under Rule 37 of the Federal Rules of Civil Procedure, the court may impose a wide array of sanctions for discovery-related abuses. *See* Fed. R. Civ. P. 37; *see also De Espana v. American Bureau of Shipping*, No. 03 Civ. 3573, 2007 WL 1686327, at *2 (S.D.N.Y. June 6, 2007). The court may also impose sanctions based on its "inherent power to manage its own affairs." *Residential Funding Corp. v. Degeorge Fin. Corp.*, 306 F.3d 99, 106-107 (2d Cir. 2002); *see also West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999); *Reilly v. Natwest Markets Group Inc.*, 181 F.3d 253, 267 (2d Cir. 1999) ("Whether exercising its inherent power, or acting pursuant to Rule 37, a district court has wide discretion in sanctioning a party

for discovery abuses."), *cert. denied*, 528 U.S. 1119 (2000); *USA Gateway Inc. v. Spring Travel*, No. 03 Civ. 4026, 2004 WL 3030183, at *4 (S.D.N.Y. Dec. 30, 2004); *Dimensional Sound, Inc. v. Rutgers University*, No. 92 CIV. 2350, 1996 WL 11244, at *3 (S.D.N.Y. Jan.10, 1996) ("Rule 37 sanctions are intended to ensure that a party does not benefit from its failure to comply [with discovery].").

Spoliation is "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *West*, 167 F.3d at 779. A sanction for spoliation of evidence should be designed to: "(1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore 'the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party.'" *West*, 167 F.3d at 779 (quoting *Kronish v. United States*, 150 F.3d 112, 126 (2d Cir. 1998)).

To establish that sanctions for spoliation are warranted, a party must demonstrate:

(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a "culpable state of mind;" and (3) that the destroyed evidence was "relevant" to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.

*Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 220 (S.D.N.Y. 2003) (citing *Byrnie v. Town of Cromwell*, 243 F.3d 93, 107-12 (2d Cir. 2001)); *see also De Espana*, 2007 WL 1686327, at *2.

Where a party has demonstrated "willfulness, bad faith or fault," *West*, 167 F.3d at 779, "[o]utright dismissal of a lawsuit . . . is within the court's discretion." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43-45 (1991). However, "because dismissal is a 'drastic remedy,' it 'should be imposed only in extreme circumstances, usually after consideration of alternative, less

drastic sanctions.'" *West*, 167 F.3d at 779 (citing *John B. Hull, Inc. v. Waterbury Petroleum Prods.*, 845 F.2d 1172, 1176 (2d Cir. 1988)) (further citations omitted); *see also Salahuddin v. Harris*, 782 F.2d 1127, 1132 (2d Cir. 1986) (dismissal based on a breach of discovery obligations is "a drastic penalty," imposed only under "extreme circumstances"). Nevertheless, a court "should not shrink from imposing harsh sanctions where . . . they are clearly warranted." *Jones v. Niagara Frontier Transp. Auth.*, 836 F.2d 731, 735 (2d Cir. 1987) (further citations omitted). In order to dismiss an action based on spoliation of evidence, a court must consider:

> (a) willfulness or bad faith of the noncompliant party; (b) the history, if any, of noncompliance; (c) the effectiveness of lesser sanctions; (d) whether the noncompliant party had been warned about the possibility of sanctions; (e) the client's complicity; and (f) prejudice to the moving party.

*Metropolitan Opera Ass'n v. Local 100, Hotel Employees and Restaurant Employees Int'l Union*, 212 F.R.D. 178, 220 (S.D.N.Y. 2003).

"Lesser sanctions, such as an adverse inference instruction, may be imposed where a party has breached a discovery obligation through ordinary negligence." *De Espana*, 2007 WL 1686327, at *3; *see also Kronish*, 150 F.3d at 126 (destruction of evidence "germane to proof of an issue at trial can support an inference that the evidence would have been unfavorable to the party responsible for its destruction"); *Residential Funding*, 306 F.3d at 107; *Byrnie*, 243 F.3d at 107-12; *L-3 Communications Corp. v. OSI Systems, Inc.*, No. 02 Civ. 9144, 2006 WL 988143, at *13 (S.D.N.Y. Apr. 13, 2006).

## 1. Obligation to Preserve Evidence

In considering defendant's spoliation motion for sanctions, the court must first determine whether plaintiff had an obligation to preserve the turbine in its damaged state. *See*

*De Espana*, 2007 WL 1686327, at *2  A party has a duty to preserve evidence when it "has notice that the evidence is relevant to the litigation, or should have known that the evidence might be relevant to future litigation."  *Id.*; *see also Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001); *Byrnie*, 243 F.3d at 107-12; *Pace v. National Railroad Passenger Corp.*, 291 F. Supp. 2d 93, 98 (D. Conn. 2003)

In this case, plaintiff had an obligation to preserve the turbine because it knew, or should have known, that the turbine would be relevant to the litigation.  *See De Espana*, 2007 WL 1686327, at *2 (finding that plaintiff had a duty to preserve evidence and failed to do so by placing a "litigation hold on its agencies and ministries" more than a year after the subject maritime accident and six months after commencing suit).  The turbine allegedly failed on May 5, 2005.  (Compl. ¶ 10)  Plaintiff promptly thereafter wrote two letters to the Director of Risk Management for Power Cooling, dated May 13 and May 23, 2005 (*see* doc. no. 46, Exhs. A and B).  The latter letter advised Power Cooling that the turbine was in the process of being moved and, the very next day, "[would] be repaired and processed by Energy Resources," and that Power Cooling's "ability to review the steam turbine in its present condition will require your presence for this disassembly, if desired."  (*Id.*, Exh. B.)  Plaintiff thus knew that the turbine would be relevant to future litigation, and therefore had a duty to preserve the turbine.  *See De Espana*, 2007 WL 1686327, at *2.  Plaintiff assured defendant that "all parts" from the disassembly would be retained, however, plaintiff failed to preserve the turbine in its damaged state and its parts.  By the time defendant's metallurgist examined the turbine, all but one stage and a few blades were disassembled or missing.  (*See* doc. no. 40; doc. no. 41, Exh. E.)

## 2.      Culpability

The court must next determine whether plaintiff acted with sufficient culpability to warrant the imposition of sanctions. *De Espana*, 2007 WL 1686327, at *3. "The degree of culpability bears on the severity of sanctions that are warranted. Severe sanctions for discovery violations, including dismissal, may be imposed for intentional conduct, such as bad faith or gross negligence." *Id.* To warrant the imposition of a lesser sanction, such as an adverse inference instruction, a party need only act "knowingly, even if without intent to [breach a duty to preserve the evidence], or negligently." *Residential Funding*, 306 F.3d at 108.

In *Beers v. General Motors Corp.*, No. 97-CV-482, 1999 WL 325378, at *1 (N.D.N.Y. May 17, 1999), for example, plaintiff was injured when an engine cooling fan in the vehicle on which he was working broke off and struck him. Without notice to defendant, plaintiff's expert examined fan, "irreparable altered it" by disassembling it and, soon thereafter, lost it. *See id.* The court found that dismissal based on spoliation of evidence was appropriate because plaintiff's expert was "grossly negligent in permanently altering, and then even worse, losing the very item" upon with the lawsuit was based, a lesser sanction would not "cure the prejudice" to defendant, and plaintiff's counsel's "disregard of discovery and other orders of the court" demonstrated bad faith. *Id.* at *4-5, 7. *See also Metropolitan Opera*, 212 F.R.D. at 222, 224 (entering judgment in plaintiff's favor because defense counsel "was not merely negligent but was aggressively willful" in failing to provide discovery, and there was "ample evidence of willfulness and bad faith").

In *West*, on the other hand, the Second Circuit overturned the district court's conclusion that "dismissal constituted the only adequate sanction." *West*, 167 F.3d at 780.

Plaintiff, the owner of an automobile body shop, was injured when a tire exploded as he attempted to mount two 16-inch tires on 16.5 inch tire rims. *See id.* at 778. Plaintiff sued the tire and rim manufacturers for negligence. *See id.* After taking pictures of the one still-inflated wheel, plaintiff's attorneys deflated it without notice to defendants. *See id.* In addition, one month before defendants were scheduled to view plaintiff's tire mounting machine and air compressor, plaintiff sold the equipment without notice to defendants. *See id.* Although defendants eventually located the mounting machine and air compressor, their conditions had deteriorated. *See id.* Defendants therefore moved for dismissal based on spoliation of evidence, which the trial court granted, finding that "the disabilities that defendants would suffer at trial could not be redressed by any sanction short of dismissal." *Id.* at 780. The Second Circuit disagreed, finding that dismissal was not necessary "in order to vindicate the trifold aims of: (1) deterring future spoliation of evidence; (2) protecting the defendants' interests; and (3) remedying the prejudice defendants suffered as a result of [plaintiff's] actions." *Id.* Instead, the Second Circuit found that the trial court could have "combined alternative sanctions in a way that would fully protect [defendants] from prejudice," such as providing an adverse inference instruction, or precluding plaintiff from offering evidence regarding the non-exploded tire, mounting machine and air compressor. *Id.; see also De Espana*, 2007 WL 1686327, at *5 ("Because this court does not find sufficient evidence demonstrating bad faith, willfulness or gross negligence by [plaintiff], dismissal of the action, or dismissal of certain claims in this action, is not an appropriate remedy.").

        In this case, defendant has demonstrated that plaintiff destroyed the turbine knowingly and willfully, but has not demonstrated that plaintiff acted with "bad faith" to warrant

dismissal of the action.  *Metropolitan Opera,* 212 F.R.D. at 224.  As noted above, plaintiff first notified Power Cooling on May 13, 2005 that it "would seek to hold Power Cooling . . . responsible" for the turbine's failure.  (Doc. no. 41, Exh. A.)  Ten days later, plaintiff again wrote to Power Cooling – at 3:11 p.m. on May 23, 2005 – notifying defendant that it would repair and reassemble the turbine, and that "this breakdown of the turbine will take place on May 24th, 25th, and 26th."  (*Id.*, Exh. B.)  Therefore, in order to observe the disassembly, much less object to the turbine's destruction, defendant would have had to respond the same afternoon it received plaintiff's May 23, 2005 letter.  Moreover, the insurance carrier for Power Cooling, CSB, did not receive plaintiff's May 23, 2005 letter until May 27, 2005, at which point the turbine was already destroyed.  (*See* Bernstein Aff., ¶ 2.)  The court finds that because plaintiff offered defendant minimal opportunity to observe or object to the turbine's disassembly, plaintiff did not act with the requisite level of bad faith to warrant the "drastic" sanction of dismissal.  *See Residential Funding*, 306 F.3d at 108; *West*, 167 F.3d at 779; *cf. Beers*, 1999 WL 325378, at *7.

On the other hand, because plaintiff knowingly altered or destroyed the turbine and provided defendant with only negligible prior notice, plaintiff acted with the requisite culpability to warrant a lesser sanction, such as an adverse inference instruction or preclusion. *See West*, 167 F.3d at 780.  An adverse inference instruction is available for knowing or negligent destruction of evidence:

> [The] sanction [of an adverse inference] should be available even for the negligent destruction of documents if that is necessary to further the remedial purposes of the inference.  It makes little difference to the party victimized by the destruction of evidence whether that act was done willfully or negligently.  The adverse inference provides the necessary mechanism for restoring the evidentiary balance.  The inference is adverse to the destroyer not because of any finding of moral culpability, but because the risk that the evidence would have

been detrimental rather than favorable should fall on the party
responsible for its loss.

*Turner v. Hudson Transit Lines, Inc.*, 142 F.R.D. 68, 75 (S.D.N.Y. 1991); *see also Residential Funding*, 306 F.R.D. at 108.

### 3.      *Relevance of Missing Evidence*

The court must next determine whether the destroyed evidence was "'relevant' to the party's claim or defense such that a reasonable trier of fact would find that it would support that claim or defense."  *Residential Funding*, 306 F.3d at 107; *see also Zubulake*, 220 F.R.D. at 220 ("A party seeking . . . sanctions . . . based on the spoliation of evidence must establish . . . that the destroyed evidence was 'relevant' to the party's claim or defense such that a reasonable trier of fact would find that it would support that claim or defense."); *Pace*, 291 F. Supp. 2d at 98.  As the Second Circuit explained,

> [R]elevant in this context means something more than sufficiently probative to satisfy Rule 401 of the Federal Rules of Evidence . . . . Courts must take care not to "hold[] the prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed [or unavailable] evidence," because doing so "would subvert the . . . purposes of the adverse inference, and would allow parties who have . . . destroyed evidence to profit from that destruction."

*Residential Funding*, 306 F.2d at 108-109 (quoting *Kronish*, 150 F.3d at 128; *Byrnie*, 243 F.3d at 110).  A showing that a party destroyed evidence in bad faith is "sufficient circumstantial evidence from which a reasonable fact finder could conclude that the missing evidence was unfavorable to that party."  *Id.* at 109; *see also M & T Mortgage Corp. v. Miller*, No. CV 2002-5410, 2007 WL 2403565, at *10-11 (E.D.N.Y. Aug. 17, 2007) (noting that the "missing documents are clearly critical to plaintiff's claims," and imposing sanctions for spoliation because "defendants acted in bad faith in destroying the documents [and] such improper conduct

-18-

alone is sufficient to support a finding that the documents were unfavorable to" defendants). A showing that a party destroyed evidence through gross negligence could also, "in some circumstances, standing alone," lead to the same conclusion. *Residential Funding*, 306 F.2d at 109. However, "where the culpable party was negligent, there must be extrinsic evidence to demonstrate that the destroyed evidence was relevant and would have been unfavorable to the destroying party." *De Espana*, 2007 WL 1686327, at *6. "This corroboration requirement is even more necessary where the destruction was merely negligent, since in those cases it cannot be inferred from the conduct of the spoliator that the evidence would even have been harmful to him." *Zubulake*, 220 F.R.D. at 221 (quoting *Turner*, 142 F.R.D. at 77).

"Typically, the evidence used to establish relevance of missing documents is deposition testimony." *De Espana*, 2007 WL 1686327, at *8 (finding that there was no deposition testimony to support a finding that the plaintiff's missing emails were relevant to plaintiff's allegedly reckless response to a maritime accident); *see also Residential Funding*, 306 F.3d at 109; *Brynie*, 243 F.3d at 109-110 (finding that the missing interview notes and response to plaintiff's administrative claim were relevant based, in part, on deposition testimony); *In re NTL Securities Litig.*, Nos. 02 Civ. 3013 & 7377, 2007 WL 241344, at *22 (S.D.N.Y. Jan. 30, 2007) ("[P]laintiffs have supplied proof that the missing evidence was likely to have been favorable to them: The . . . plaintiffs have submitted emails produced by individual defendant George Blumenthal, in which the company's financial strategies are discussed by its directors, officers and managers, that tend to support plaintiffs' allegations in this case."), *adopted*, No. 02 Civ. 7377, 2007 WL 1318632 (S.D.N.Y. May 17, 2007); *Buskey v. Boston Market Corp.*, No. 04 CV 2193, 2006 WL 2527826, at *9 (E.D.N.Y. Aug. 14, 2006) ("In light of [the witness']

testimony, it is certainly possible, if not likely, that a reasonable jury could infer that the [missing] report is unfavorable to Defendant, and that Defendant withheld the accident report in fear of the present litigation.").

In this case, it is clear that the missing and destroyed turbine parts are relevant to the parties' claims and defenses. Due to the destruction of the turbine parts however, defendant cannot offer and has not presented any evidence whatsoever that an inspection of the complete turbine would reveal that Power Cooling was not responsible for its failure. Indeed, defendant's expert metallurgist, Joseph Crosson, states in his affidavit that "in order to determine the root cause of turbine failure it is necessary to examine every failed blade." (Doc. no. 46, Exh. C, ¶¶ 13-14.) The court recognizes that this is a catch–22 situation. *See, e.g., Sovulj v. United States of America*, No. 98 CV 5550, 2005 WL 2290495, at *5 (E.D.N.Y. Sept. 20, 2005) ("[T]o obtain an adverse inference, plaintiff must present evidence that the tumor would have been visible on the x-ray, but without the x-ray, plaintiff's medical expert is 'not comfortable to say within a reasonable degree of medical certainty' that the tumor would be visible on the x-ray.").

Although defendant could have sought and introduced other evidence to support its causation defense, such as testimony from Energy Resources employees who participated in disassembling the turbine, or Power Cooling employees who observed the turbine's failure, defendant has not offered any such evidence. Accordingly, although defendant has demonstrated that (1) plaintiff had a duty to preserve the turbine, and (2) plaintiff acted with a culpable state of mind in knowingly destroying the turbine, defendant has not demonstrated that (3) an inspection of the complete turbine would support Power Cooling's defenses. *See De Espana*, 2007 WL 1686327, at *8; *Sovulj*, 2005 WL 2290495, at *5 ("Given that plaintiff has failed to produce

*any* evidence to support her claim that the x-ray is relevant to her case, the motion for an adverse inference must be denied."); *Turner*, 142 F.R.D. at 77 (in a personal injury action, plaintiff presented "no evidence that the destroyed [maintenance] records would have shown whether the brakes were in good working order"); *Zubulake*, 220 F.R.D. at 221 (finding that there was no evidence that missing emails were "likely to support [plaintiff's] claims," as the majority of the missing emails covered a time period prior to plaintiff's alleged discrimination).

Here, the court has denied defendant's motion to dismiss the complaint for spoliation of evidence and instead considers less drastic sanctions. Based on the foregoing considerations regarding defendant's inability to demonstrate that inspection of the complete turbine would support defendant's defenses, an adverse inference instruction is not warranted.

## C.  *Availability of Alternative Sanctions*

Nevertheless, because plaintiff knowingly destroyed the turbine, alternative sanctions may be imposed. *See West*, 167 F.3d at 780. As noted above, sanctions should be designed "to serve the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine." *Id.* at 779. "The court must determine the appropriate sanction based on the relative fault of the party against whom sanctions are sought and the prejudice suffered by the party seeking sanctions." *Klezmer v. Desyatnik*, 227 F.R.D. 43, 51 (E.D.N.Y. 2005) (citing *Townes v. Cove Haven*, No. 00 Civ. 5603, 2003 WL 22861921, at *3-4 (S.D.N.Y. Dec. 2, 2003)). Courts determine the form of sanctions on a case-by-case basis. *See id.*; *see also Reilly*, 181 F.3d at 267. As the Second Circuit found, "Trial judges should have the leeway to tailor sanctions to insure that spoliators do not benefit from their wrongdoing – a remedial purpose that is best adjusted according to the facts and evidentiary posture of each case." *Reilly*, 181 F.3d at 267;

*see also Fujitsu*, 247 F.3d at 436 ("The determination of an appropriate sanction for spoliation, if any, is confined to the sound discretion of the trial judge and is assessed on a case-by-case basis.") (internal citations omitted).

Here, plaintiff's almost total destruction of the turbine has prejudiced defendant's ability to contest the cause of the turbine's failure. Plaintiff alleges that the "catastrophic damage" to the turbine was caused by defendant's "negligence, carelessness and/or negligent omissions . . . including but not limited to negligence in" training and supervision, failing to use a calibrated tachometer when testing the turbine, failing to follow the owner's guide when servicing the turbine, allowing the turbine to exceed maximum speed, failing to properly align the turbine, failing to properly install the trip mechanism, failing to secure the coupling near the eighth stage and failing to perform in accordance with industry standards and practice. (Compl. ¶ 18.) After Energy Resources completed repairing the turbine, only the eighth stage and rotor shaft remained. (*See* doc no. 41, Exh. E.) Twenty blades from the eighth stage were reverse manufactured, less than five blades from the eighth stage were sent to MIT (and subsequently to plaintiff's counsel's office, per this court's 5/23/07 order), and fifty-three blades from the same stage are missing. (*See id.*; *see also* doc. no 40 at 1; doc. no. 46, Exh. C, ¶ 7.) Therefore, all but one stage of the turbine has been disassembled, and the remaining stage is incomplete.

Defendant's expert metallurgist requires the complete turbine in order to rebut the opinion of plaintiff's expert, Thomas Eager, regarding the cause of the turbine's failure. Eager concluded that "there was no pre-existing defect in the turbine and that the failure did not occur as a single overload event. Several pieces of evidence indicate repeated, extreme stress events during turbine operation . . . . The cause of extreme stress was an overspeed of the turbine."

(Doc. no. 40, Exh. A.)  He continued, "[t]he damage to the turbine was the result of the inappropriate operation of the steam turbine during the overspeed testing being performed by Power Cooling Inc. on May 5. 2005."  (*Id.*, Exh. B at 11.)

Although defendant's steam turbine expert, Jeffrey Porges, testified that examination of the complete turbine was not necessary to his determination of the cause of its failure, defendant's metallurgist, Joseph Crosson, testified differently.  (*See* doc. no. 41, Exh. G.) Crosson stated that, in order to determine "the root cause of the failure of the turbine, . . . it would be necessary to examine the condition and fractures of *all the missing blades . . . .*"  (Doc. no. 46, Exh. C, ¶ 14, emphasis added.)  In contrast to Eager's conclusion, Crosson noted that with respect to the turbine parts available for examination, "[t]he damaged areas did not exhibit any clear evidence of progressive fracture such as fatigue or stress-corrosion cracking."  (*Id.*) Furthermore, Crosson continued, "Results of this examination did not reveal any information which could be relied upon to form an opinion as to the root cause of the turbine failure with a reasonable degree of engineering certainty."  (*Id.* ¶ 13.)  Crosson concluded that "[i]n order to make such a determination[,] it would be necessary to examine the condition and fractures of all the missing blades for evidence of overstress fracture, progressive fracture, erosion, corrosion, etc."  (*Id.*)

Therefore, the absence of seven turbine stages and approximately 56 blades from the eighth turbine stage deprived defendant of an opportunity to adequately rebut plaintiff's expert's opinion, and "determine where, how, and why this failure started."  (Doc. no 40 at 2.) Defendant's expert metallurgist has demonstrated that without a complete examination of the turbine, defendant cannot now rebut plaintiff's allegations in the complaint or plaintiff's expert's

conclusions.  *See Byrnie*, 243 F.3d at 109-110.

        Accordingly, the court finds that precluding plaintiff from introducing evidence regarding the missing or altered turbine parts will best serve "the trifold aims" of a spoliation sanction.  *West*, 167 F.3d at 780; *see also Kronish*, 150 F.3d at 126; *M & T Mortgage*, 2007 WL 2403565, at *12 (precluding defendants from offering documentary evidence not previously produced).  As suggested by the Second Circuit as an alternative to dismissal or an adverse inference instruction, precluding the spoliator from introducing evidence relating to the altered or destroyed turbine parts serves to: (1) deter future spoliation of evidence; (2) protect defendant's interests; and (3) remedy the prejudice defendant suffered as a result of not being able to inspect the complete turbine.  *See id.*; *see also David Steel Prods. v. M/V Fakredine*, 951 F.2d 1357, 1366 (2d Cir. 1991) (barring party from presenting evidence opposing claim); *Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710, 719-21 (3d Cir. 1997) (preventing spoliator's expert witness from testifying about spoliated evidence), *cert. denied*, 522 U.S. 1128 (1998); *Dillon v. Nissan Motor Co.*, 986 F.2d 263, 267 (8th Cir. 1993) (same).

## CONCLUSION

        The court denies defendant's motion to dismiss this action because defendant has failed to demonstrate that plaintiff acted with the requisite "willfulness or bad faith" required for such a drastic sanction.  *West*, 167 F.3d at 779; *see also Metropolitan Opera*, 212 F.R.D. at 220. Further, an adverse inference is also unwarranted because defendant has failed to demonstrate that an inspection of the complete turbine would likely support its defense.  *See Residential Funding*, 306 F.2d at 109; *Byrnie*, 243 F.3d at 109-110.  However, because defendant has been

prejudiced by its inability to inspect the complete turbine, the court hereby precludes plaintiff from introducing any evidence regarding the missing or destroyed turbine parts at trial, or for any other purpose. *See West*, 167 F.3d at 780; *De Espana*, 2007 WL 1686327, at *5. In these circumstances, precluding plaintiff from offering evidence regarding the altered and missing material is just and authorized by the court's inherent power to sanction discovery abuse, and by Rule 37 of the Federal Rules of Civil Procedure. *See Reilly*, 181 F.3d at 267.

**SO ORDERED.**

Dated: September 10, 2007
      Brooklyn, New York

                        _____/s/_____
                        **Kiyo A. Matsumoto**
                        United States Magistrate Judge